**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**CHRISTOPHER RAY CARWILE**                                                  **PLAINTIFF**

**vs.**                                                                **No. 3:22cv039-MPM-RP**

**AMERICAN NATIONAL PROPERTY
AND CASUALTY COMPANY**                                         **DEFENDANT**

**ORDER**

This cause comes before the court on the motion of defendant American National Property and Casualty Company (ANPAC) for summary judgment, pursuant to Fed. R. Civ. P. 56. Plaintiff Christopher Carwile has responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, is prepared to rule.

This is an insurance bad faith case arising out of ANPAC's denial of plaintiff's claim for property damage to his home located in Water Valley. On or about January 28, 2019, plaintiff filed a claim with the defendant's claims department about damage to his home which manifested itself in the floors shifting and separating from the walls. [Deposition of Christopher Carwile p.10:19-25]. On February 11, 2019, Anwar Robinson, a claims representative for ANPAC, was assigned to process the claim. [Affidavit of Anwar Robinson ¶5]. Three days later, Mr. Robinson conducted an inspection of the home, but he never inspected or viewed the crawlspace beneath it. [Deposition of Stephanie Carwile p.14:9-25]. Mr. Robinson concluded that the damage was caused by settlement and sent a formal denial letter on February 27, 2019. [Aff. Robinson ¶16].

Believing Robinson to have erred, plaintiff cut a hole in the floor of his house in order to inspect the area beneath it. [Depo. Chris Carwile p.14:6-14.] This led to the discovery of sewage

1

six inches deep resulting from either a total separation or collapse of the sewer pipe. [Deposition of John Lewis p.13:6-7]. Plaintiff repaired the sewage pipe, pumped out the sewage, and braced the house in an attempt to prevent any more separation of the floors from the walls. [Deposition of Randall Foster p. 20:14-23]. Plaintiff filed another claim with ANPAC on July 31, 2020, and claims representative Heather Broyles was assigned to evaluate it. [Id. at ¶4.] Ms. Broyles concluded that the damage was due to water damage that had been standing under the house for nearly a year, thus implicating a policy exclusion, and she issued a formal denial letter to plaintiff on August 17, 2020. [*Id*. at ¶7,8]. Feeling aggrieved, plaintiff filed the instant bad faith action in the Circuit Court of Lafayette County on January 22, 2022, and defendant timely removed the case to this court.

In seeking dismissal on summary judgment of plaintiff's claims against it, defendant relies upon a policy exclusion which provides that:

> 9. Continuous or Repeated Seepage, Leakage, Collection, or Infiltration of Water or Steam, whether known or unknown to any insured, from:
> a. within a plumbing, heating, air conditioning, or automatic fire protective sprinkler system, waterbed, or household appliance;
> b. a shower, tub, sink, or other plumbing fixture; or
> c. exterior drains, downspouts, or gutters.
> However, if a sudden and accidental discharge of steam or water from a plumbing, heating, air conditioning, automatic fire protective sprinkler system, waterbed, or household appliance, which is not otherwise excluded, causes damage to covered property and does not result in rust, corrosion, wet or dry rot, or deterioration, whether known or unknown to any insured, we will cover the cost of tearing out and replacing any part of the building necessary to repair the system or appliance. We do not cover loss to the system from which the water or steam escaped.

[Policy at 15].

In relying upon this provision, defendant emphasizes the policy's "sudden and accidental discharge" exception, in particular its caveat that the damage in question "not result in rust, corrosion, wet or dry rot, or deterioration." [Reply brief at 2]. In so relying, defendant

2

emphasizes that plaintiff's own expert John Lewis made clear his view that the damage in question "probably" resulted in "deterioration."  Specifically, Lewis testified that:

> A. The settlement in the floor, in the walls was probably caused by the deterioration of the floor support system, which was caused by the sanitary sewer. The sanitary sewer, as everyone knows, is highly corrosive. Sanitary sewer gives off hydrogen sulfide gas, which is very corrosive. Wood, metal, anything. And that caused – that caused the wood to deteriorate, and as the wood deteriorated, it lost its strength.

[Lewis Depo. at 36:3-11]

In response, plaintiff appears to acknowledge that the wood in his house "deteriorated," but he emphasizes that the policy exclusion only applies to deterioration from "water or steam," not sewage.  Specifically, plaintiff argues that:

> The Defendant further claims that even if the cause was sewage, the claim is not covered under their contract. However, the provision provided in their memorandum mentions a "continuous or repeated seepage, leakage, collection, or infiltration of water and steam", not sewage. If a contract is plain and unambiguous, it will be enforced as written. *Progressive Gulf Ins. Co. v. We Care Day Care Ctr., Inc*., 953 So. 2d 250, 253 (Miss. Ct. App. 2006). Furthermore, in the case of insurance policy ambiguity, a court will apply the interpretation favoring the insured." *Id.* Additionally, if the provision is found to be ambiguous, courts will give words their plain and ordinary and popular meaning, not a philosophical or scientific meaning." *Id*. Here, if the Defendant's did not wish to cover damage caused by sewage, they should have stated so in the contract they drafted. The Defendant alleges that the terms "water" and "sewage" are interchangeable. If handed a glass of water and a glass of sewage, which would you be willing to drink? Clearly the terms, when given their plain and ordinary meaning, are not interchangeable. Although one element of sewage is water, sewage contains elements that give off hydrogen sulfide, ammonia, methane, etc.

[Brief at 6-7].

This court agrees.  Defendant protests that "plaintiff cannot create a genuine issue of material fact simply by now rephrasing the problem as sewage and not water," [reply brief at 2] but it seems clear to this court that sewage and water are two different things with different chemical properties.  Moreover, defendant had full control over the language of its policy exclusions, and it was entirely within its power to include "sewage" within the scope of the exclusion at issue here.  Defendant failed to include such language in its policy, and, as noted by

3

plaintiff, Mississippi law makes clear that ambiguous policy language should be interpreted in favor of the insured. *Progressive*, 953 So. 2d at 253.

In deciding that a jury should evaluate plaintiff's claims, this court is also motivated by its conclusion that there are fact issues regarding whether the first adjuster Robinson acted negligently in failing to inspect underneath the house. In so stating, this court acknowledges that under Mississippi law "an adjuster is not liable for simple negligence in adjusting a claim" and that "[h]e can only incur independent liability when his conduct constitutes gross negligence, malice, or reckless disregard for the rights of the insured." *Bass v. California Life Ins. Co.*, 581 So.2d 1087, 1090 (Miss. 1991). While this language seems clear enough, it refers only to the "independent liability" of the *adjuster*, and, in asserting that ANPAC faces potential liability of its own, plaintiff notes Mississippi authority holding that "[w]hen faced with a claim, an insurer is required to perform a prompt and adequate investigation of the circumstances surrounding the claim." *Liberty Mut. Ins. Co. v. McKneely*, 862 So. 2d 530, 534 (Miss. 2003) *citing Bankers Life & Cas. Co. v. Crenshaw*, 483 So.2d 254, 276 (Miss. 1985).

In its reply brief, defendant seemingly agrees that "the standard in Mississippi law is simply whether the insurer conducted a prompt and adequate inspection," [reply brief at 7, citing *Liberty*] and this court wonders what recourse, if any, might be available in cases where an insurer fails in its duty to conduct an "adequate inspection" and the plaintiff incurs additional property damage as a result. The briefing presently before this court does not adequately answer this question, which strengthens its conclusion that dismissal would be inappropriate at this time. This strikes this court as being a difficult, and seemingly unsettled, issue of Mississippi law, since there is arguably tension between a holding that an adjuster may only be held liable for some heightened degree of fault in adjusting a claim, while at the same time imposing a duty upon the insurer to conduct an "adequate" investigation of that claim. It is unclear to this court how the Mississippi Supreme Court would

address claims similar to the ones in this case, and it may be required to issue an *Erie*-guess in this regard at trial. Even assuming that this court eventually resolves this issue in a manner favorable to defendant, the fact that there are fact issues regarding whether ANPAC "dropped the ball" in conducting an inspection and whether plaintiff suffered serious economic loss as a result serves to detract from defendant's narrative that it acted appropriately in this case. This makes this court more inclined to allow a jury to resolve the unsettled fact issues in this case, and defendant's motion for summary judgment will therefore be denied as to plaintiff's claims for compensatory damages.

    This court now turns to defendant's motion to dismiss the punitive damages claims against it. Mississippi Code Annotated § 11-1-65(1)(a) states that "[p]unitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." This is a very heavy burden for any plaintiff to meet, and this court concludes that the previously-discussed facts of this case are simply not egregious enough to create fact issues regarding whether punitive damages might be appropriate here. As in *First Pentecostal Church of Jackson v. Bhd. Mut. Ins. Co.*, Carwile has "failed to identify any evidence to suggest that [defendant] acted with malice, was grossly negligent or acted in reckless disregard of its insureds' rights." 2010 U.S. Dist. LEXIS 71386, at *23 (S.D. Miss. July 15, 2010), and defendant's motion to dismiss the punitive damages claims against it will therefore be granted.

    As a final point, this court notes that defendant has filed a *Daubert* motion to strike the testimony of plaintiff's expert Randal Foster, arguing that he "has no specialized knowledge, skill, experience, training, or education in civil engineering" and that his "opinions are unreliable because they are based upon insufficient facts." [Brief at 1]. This court has previously recognized its duty "to screen a proffered expert's testimony to determine admissibility." *Childs v. Entergy Miss., Inc.*, 2009 WL 2508128, *2 (N.D. Miss. Aug. 13, 2009). "Expert testimony is not admissible unless the

5

expert is qualified and the opinion is scientifically valid and methodologically sound." *Miller v. Genie Indus., Inc.,* 2012 WL 161408, at *4 (N.D. Miss. Jan. 19, 2012) (*citing Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 592-93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

In contending that Foster's testimony passes muster under *Daubert*, plaintiff argues that:

> Randall Foster has worked in the construction and cabinetry business for thirty-five (35) years. Deposition of Randall Foster p.6:3-13(Attached hereto as Exhibit 1). He owns his own cabinetry and construction company, Foster Custom Millworks. Id. He has inspected many homes in and around the Memphis area. Id. p.8:1-2. He has built houses from the ground up. Id. He has experience making repairs in crawlspaces by fixing broken joists, settlement, and water damage. Id. p.10:19-22. Randall Foster inspected the Carwile's residence in 2020. Id. p.10:2-5. This inspection involved him going under the house, into the crawlspace, to determine why the floors were separating from the walls. Id. p.22:18-24.

[Brief at 1].

This court agrees with plaintiff that Foster's expertise in housing and construction matters and the fact that he personally inspected the house at issue in this case means that he has potentially helpful opinions to offer the jury. In so stating, this court notes that "[a] proposed expert does not have to be 'highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility.' " *Bryant v. 3M Co.,* 78 F. Supp. 3d 626, 631 (S.D. Miss. 2015) (*quoting Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009)). In the court's view, defendant is entirely capable of casting doubt upon Foster's expertise during cross-examination, and it intends to give it wide leeway to do so. This court nevertheless concludes that Foster has potentially helpful testimony to offer the jury in this case, and the *Daubert* motion to strike his testimony will therefore be denied.

In light of the foregoing, it is ordered that defendant's motion for summary judgment is granted in part and denied in part, and its *Daubert* motion to strike Foster's testimony is denied.

This, the 6th day of April, 2023.

/s/ Michael P. Mills
**UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF MISSISSIPPI**